STATE OF CONNECTICUT *v.* TIMOTHY C. SHASHATY
(3172)

HULL, SPALLONE and BIELUCH, Js.

Argued April 3—decision released August 5, 1986

*John R. Williams,* for the appellant (defendant).

*Steven M. Sellers,* deputy assistant state's attorney, with whom, on the brief, was *John J. Kelly,* chief state's attorney, for the appellee (state).

HULL, J. The defendant was convicted after a jury trial of sexual assault in the first degree and unlawful restraint in the first degree, in violation of General Statutes §§ 53a-70 (a) and 53a-95 (a), respectively. The defendant appeals from his judgment of conviction claiming that the trial court made two errors: (1) in giving the jury a "missing witness" instruction adverse to the defendant when there was no showing that the witness was available; and (2) in permitting the prosecution to present evidence that the defendant exercised his right to remain silent after having been given *Miranda* warnings. We find no harmful error.

The jury reasonably could have found the following facts. On March 6, 1983, the victim[1] walked to a party

[1] General Statutes § 54-86d provides: "Any person who has been the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof, shall not be required to divulge his or her address or telephone number during any trial or pretrial eviden-

at the Milford home of Emily Lewis. She arrived at the party at 6 p.m. The defendant arrived at the party at 7:30 p.m., accompanied by a friend. Later in the evening, at about 11 p.m., a confrontation arose between the victim and another guest over the disappearance of the victim's purse. The victim was upset after the fight and locked herself in the bathroom. The defendant entered the bathroom and talked to the victim for some time. Eventually, the party broke up and the victim started to walk home by herself.

The victim testified that at the party, the defendant tried to kiss her. She resisted and told the defendant that she had to go home. The defendant caught up with her on her walk home and she rebuffed his demand that she walk with him. The defendant then picked her up, put her over his shoulder and began walking down the street with her. He put her down after she agreed to walk with him and hold his hand. The defendant soon put her over his shoulder again, and despite her screams, carried her through the yards of several residences before putting her down and forcing her to have sexual intercourse with him. After a few minutes, the defendant fled and the victim walked home by herself.

Lieutenant William Graham of the Milford police department testified that the victim came to the police on March 9, 1983, and reported the incident. While

tiary hearing arising from the sexual assault or injury or risk of injury to, or impairing of morals of, children; provided the judge presiding over such legal proceeding shall find: (1) Such information is not material to the proceeding, (2) the identity of the victim has been satisfactorily established, and (3) the current address of the victim is made available to the defense."

General Statutes § 54-86e provides: "The name and address of the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b, or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof shall be confidential and shall be disclosed only upon order of the superior court, except that such information shall be available to the accused."

In order to uphold the spirit of these statutes, we will not disclose the name or address of the victim. She will be referred to herein as "the victim."

awaiting the results of various laboratory tests, Milford police officers, on March 10, 1983, asked the defendant to stop by the police station to answer some questions. The defendant agreed, and was subsequently interviewed by police officers regarding the victim's sexual assault complaint. The defendant asserted his innocence after having been given full *Miranda* warnings. *Miranda* v. *Arizona,* 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He made a written statement that he had left the party with his girlfriend Melissa Junget, and two people named Billy McClafferty and Maryann Kopec. In the written statement, which was accompanied by a signed waiver of the defendant's constitutional rights, the defendant asserted that the four left in Kopec's car and that the defendant was driven to his house where he went to bed. Lewis, Kopec, McClafferty and Junget all testified, however, that the defendant remained at the Lewis house after Junget, Kopec and McClafferty had departed.

The defendant testified at trial that he did attend the Lewis party and had expected to get a ride home with Lewis' boyfriend. When the boyfriend decided to spend the night at the Lewis house, the defendant had to hitchhike home. He stated that he was picked up by someone named "Mark" and driven to his house. This person was never called as a witness and in its charge to the jury, the court gave a "missing witness" instruction respecting the defendant's failure to call him.

The defendant's first claim on appeal concerns the "missing witness" instruction given to the jury.[2] The court charged the jury as follows: "the failure of a party to call a witness . . . who . . . [is] within its power to produce entitles you, the jury, to infer that the testimony of such witness . . . would be unfavorable to that party. In this case, the defendant testified that,

---

[2] Whether the charge was requested or given sua sponte is in dispute.

after leaving the party at Emily Lewis' home, he hitch-hiked and received a ride from a person whose first name he knew to be Mark. Consistent with the rule I have just stated, you may consider the failure of the defendant to call this person."

*Secondino* v. *New Haven,* 147 Conn. 672, 165 A.2d 598 (1960), is the seminal case in Connecticut on the "missing witness" doctrine. In *Secondino,* the court stated that " '[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' . . . There are two requirements for the operation of the rule: [t]he witness must be available, and he must be a witness whom the party would naturally produce." Id., 675. A *Secondino* charge may not be given, however, unless the party claiming the benefit of the adverse inference proves that the missing witness is in fact available to the other party. *State* v. *Shindell,* 195 Conn. 128, 138–39, 486 A.2d 637 (1985); *State* v. *Boyd,* 178 Conn. 600, 605, 424 A.2d 279 (1979).

The state offered no evidence as to the availability of "Mark" and it concedes that the *Secondino* charge delivered by the trial court was both unwarranted and incorrect as a matter of law. The state claims, however, that the defendant has not established, as he must, the harmfulness of the trial court's error.

When a defendant's claim of error on appeal is not of a constitutional nature, the burden rests upon the defendant to demonstrate that the claimed erroneous action of the trial court would have been likely to affect the result. *State* v. *Gonzalez,* 197 Conn. 677, 681, 500 A.2d 1330 (1985); *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980); *State* v. *Ruth,* 181 Conn. 187, 197, 435 A.2d 3 (1980). Because the defendant's claim of

error involves only an evidentiary matter, and not the violation of a constitutional right, the burden of proving the harmfulness of the charge rests upon the defendant. See *State* v. *Gonzalez,* supra, 681.

The defendant offers only one statement to support his claim of harm. He claims in his brief that "permitting such an inference to be drawn against a defendant in a criminal case under any circumstances violates the presumption of innocence and denies due process of law." This statement is insufficient to support the defendant's burden of proving harmfulness.

As the only evidence of the defendant's alibi was his own testimony, it is obvious that his credibility was very important. That credibility had been severely damaged already, however, when he admitted that he lied about his whereabouts to the police in his written statement. In light of that repudiated statement and the testimony of the victim herself, any prejudice to the defendant by the erroneous *Secondino* charge is minimal. When faced with a similar situation, our Supreme Court in *State* v. *Gonzalez,* supra, held that comments made by the prosecution with respect to the failure to call a witness constituted harmless error. We likewise conclude that the error was harmless.

The defendant's second claim is that the trial court erred in permitting the state to question a police officer to show that between the time of his first statement and his arrest, the defendant did not contact the police to correct that statement. According to the defendant, introduction of this evidence violated his right to remain silent as interpreted by the United States Supreme Court in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). We agree.

It has long been clear that when an accused is in custody, "our law affords him the right to reply to [a] question or statement, or to remain silent." *State* v.

*Ferrone,* 97 Conn. 258, 266, 116 A. 336 (1922). In *Doyle* v. *Ohio,* supra, 619, the United States Supreme Court determined that this right is violated by "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after [he] receiv[es] *Miranda* warnings . . . ." The state does not contest this general rule but argues that where, as here, a defendant makes a statement, his *silence,* after custodial interrogation has ended, may then be used for impeachment. In support of this argument, the state relies on the rule that if the defendant chooses not to remain silent any *statement* he makes "after *Miranda* warnings have been given, relating to the facts of the crime with which [he] is charged, may be used to impeach his credibility by illustrating inconsistencies between that statement and a different exculpatory statement given during his in-court testimony. *State* v. *Reid,* 193 Conn. 646, 480 A.2d 463 (1984)." *State* v. *Apostle,* 8 Conn. App. 216, 222, 512 A.2d 947 (1986).

This court has recently rejected the state's claim that post-statement silence may be used for impeachment purposes. *State* v. *Apostle,* supra. In *Apostle,* a case that is factually very similar to the present case, we held that the state may not question a defendant or comment about his failure to correct, after a police interrogation has ended, a false statement made during that interrogation.[3] That decision was based, in part, on the fact that "[a] defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he

_____

[3] In *State* v. *Apostle,* 8 Conn. App. 216, 227–28, 512 A.2d 947 (1986), in contrast to this case, the state questioned the *defendant,* not the police officer, about his failure to change his statement. We view this difference to be of no significance. It is error to admit evidence of a defendant's failure to change a statement after in custody interrogation has ended regardless of how that evidence is offered.

is relying upon that right." Id., 224. Accordingly, we conclude that the trial court should not have allowed the state to question the police officer about the defendant's failure to correct his statement.

Having determined that the trial court erred, we must next determine whether reversal of the defendant's conviction must follow. "Under certain circumstances, the state's use of a defendant's post-arrest silence does not constitute reversible error. In limited instances, ' "[w]hen there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error." *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977) . . . . ' " *State* v. *Apostle,* supra, 227, quoting *State* v. *Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979). We conclude that applying these standards, this case presents one of those "few instances"; *State* v. *Apostle,* supra; where the error was harmless.

Here, in contrast to *Apostle,* the state did not *comment* on the defendant's failure to change his statement. Rather, the state's attorney merely asked the officer as a factual matter whether "at any time, [he] receive[d] any contact from [the defendant] and information from him that he had either been mistaken or lied in his statement." After the officer answered no, the state's attorney then asked whether the officer had been "advised of the existence of any individual by the name of Mark, who allegedly picked [the defendant] up while he was hitchhiking home from Emily Lewis's party on March 6?" When the officer stated that he had not, the line of questioning was dropped. This testimony was not commented on or emphasized in closing argu-

ment. Additionally, the defendant's alibi defense had already been substantially damaged by introduction of the statement he gave to the police which was contradicted by four witnesses in addition to the victim. In the light of these factors, we conclude that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible questioning.

There is no error.

In this opinion the other judges concurred.